UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JODY D. TERWILLIGER,         )
                                    )
       Plaintiff,          )
                                    )
      vs.               )      Case No. 2:14CV18 CDP
                                    )
CAROLYN W. COLVIN,        )
Acting Commissioner of Social Security, )
                                    )
       Defendant.      )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for judicial review of the Commissioner's final decision denying Jody D. Terwilliger's application for supplemental security income (SSI) under Title XVI of the Social Security Act. 42 U.S.C. §§ 1381 *et seq*. Terwilliger claims she is disabled because she suffers from a combination of impairments, including schizophrenia, asthma, seizure disorder, depression, anxiety, Hepatitis C, and bi-polar disorder. After a hearing, the Administrative Law Judge concluded that given Terwilliger's age, education, work experience, and residual functional capacity, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy. Because I find that the ALJ did not properly analyze the weight to accord the opinion of Terwilliger's treating psychologist, I will reverse and remand for further proceedings.

# I.    Procedural History

Terwilliger filed her application for supplemental security income benefits on April 22, 2011. She initially alleged an onset date of November 1, 2008 (Tr. 133), but this date was amended to June 30, 2011 via a letter from Terwilliger's counsel on October 1, 2012. (Tr. 152).

When her application was denied, Terwilliger requested a hearing before an administrative law judge. She then appeared at an administrative hearing on November 20, 2012, where she was represented by attorney Frank T. Cook. Terwilliger and a vocational expert testified at the hearing.

After the hearing, the ALJ denied Terwilliger's application, and she appealed to the Appeals Council. On December 19, 2013, the Council denied her request for review. The ALJ's decision thereby became the final decision of the Commissioner. *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Terwilliger now appeals to this court. She argues that the ALJ erred by failing to properly evaluate the medical opinion of her treating psychologist, Dr. Marta Fliss, as to her mental impairments. Terwilliger claims these mistakes led to a decision by the ALJ that was not supported by substantial evidence and should be reversed and remanded for further evaluation.

## II.    **Evidence before the Administrative Law Judge**

*Prior Disability Decisions*

Terwilliger's Disability Report – Field Office, dated April 22, 2011,

indicates that she filed a previous disability insurance claim that was denied on

January 18, 2011.  (Tr. 187).  Additionally, the consultant who provided a

psychiatric review technique after reviewing Terwilliger's records indicated in her

notes that this is Terwilliger's fourth application for benefits.  (Tr. 667).   No

records from previous applications were included in the record before this court.

*Function Reports*

Terwilliger completed a function report for herself on May 28, 2011.  She

reported that she lived in a women's shelter; her daily activities involved going to

group and individual counseling, eating meals and watching TV.  She indicated she

does not take care of any other people or any pets.  She wrote that prior to her

disability she was able to care for herself and work part time.  She reported her

impairments cause her to have difficulty sleeping and maintaining personal care.

She noted she is a "sloppy dresser," does not bathe when she is depressed or

manic, does not shave, and does not cook.  She needs reminders to brush her hair

and teeth when she's depressed and needs to have her medications managed

because she forgets to take them at all or takes them and accidentally re-takes

them.  She wrote that she cannot prepare meals because she doesn't have the

attention span for it.  She does not do house or yard work because she gets overwhelmed and frustrated, but she can do laundry with help.  She indicated she can go out alone and is able to ride in a car.  She does not drive but she does shop infrequently.  She wrote that since the onset of her impairments, she is unable to pay bills, count change, handle a savings account or use a checkbook.

Terwilliger reported her hobbies include reading and watching TV, but she has difficulty concentrating long enough to read.  She claimed she used to be able to read all the time and sit through a 2-hour movie but cannot do these things now.

Socially, Terwilliger reported she watches TV with others and talks about her day approximately 2-3 times per week.  She sometimes goes to church on Sundays.  Every other day but Sunday, she reported going to Community Mental Health, but wrote that she needs reminders to go.  She reported having difficulty getting along with friends and family; she wrote that she no longer has the desire to go places she used to go, like the club, the zoo, and work-related social events.

Terwilliger indicated her bipolar disorder causes her to have memory and concentration problems.  She cannot follow directions well because she forgets what she is supposed to do.  She reported getting along well with authority figures as long as she is on her medication but noted that she has problems following directions and does not like people telling her what to do.  She indicated she was terminated from her job at House of Hope for not getting along with people.  Her

reaction to stress is to stay in bed or get frustrated and snap at people. Her reaction to changes in routine is to get nervous and frustrated, which causes her to shut down or lash out at others. She reported that she is afraid of people, and afraid of being alone and unable to care for herself.

Finally, Terwilliger reported that her anxiety, depression and schizophrenia have become worse than they used to be and require stronger medication. She claimed she cannot be left alone for fear she will hurt herself. (Tr. 227-234).

In a Missouri supplemental questionnaire, Terwilliger noted that she was currently taking approximately 20 separate medications. (Tr. 236-37).

### *Medical Records[1]*

Terwilliger was admitted to Cox Health psychiatric unit on May 14, 2010. The notes from her visit indicate she had been staying at a "Family Violence Center" nearby and felt that she needed her medications regulated. At admission she was very emotional, reported being depressed, hearing voices at night, and feeling hopeless and worthless. A history of prior suicide attempts and overdoses was noted. Her mental status examination revealed that her mood and affect were depressed, she reported feeling hopeless and worthless but denied feeling suicidal or homicidal. Her insight and judgment were impaired. While admitted, her medications were adjusted and she participated in the unit's "psychotherapeutic

---

[1] Although I have carefully reviewed all of the medical evidence, only medical records relevant to the ALJ's decision and Terwilliger's challenges to the ALJ decision are discussed.

milieu, to which she responded well." She was diagnosed with "major depression, recurrent" and PTSD "by history." She was assigned a GAF of 35 upon admission and a GAF of 70 upon discharge. Upon discharge she was psychiatrically stable. (Tr. 257-269).

On May 28, 2010, Terwilliger was again admitted to Cox Health psychiatric unit; she was discharged on June 4, 2010. She had recently been in a fight with another woman at the Domestic Violence Center and when she came to the hospital, she complained of suicidal ideation and voices telling her to kill another woman. Upon admission, her psychiatric evaluation indicated she had major depression, recurrent, severe with psychotic features; polysubstance dependence; and post-traumatic stress disorder with a GAF of 35. Upon discharge, she was diagnosed with adjustment disorder with mixed features of emotion and conduct; major depression, recurrent by history; and rule out bipolar disorder type 2. On discharge she was assigned a GAF of 70. (Tr. 270-281).

Again on June 7, 2010 Terwilliger was admitted to the Cox Health psychiatric unit. She was discharged on June 22 with a diagnosis of adjustment disorder with mixed features of emotion and conduct and bipolar disorder type II. She was assigned a GAF of 20 on admission and 70 on discharge. Terwilliger was "positive for suicidal ideation at the time of admission with a plan to overdose on her medication." (Tr. 281-292).

On July 21, 2010, Terwilliger was again admitted to the Cox Health psychiatric unit complaining that she had stopped taking her medications and was feeling more depressed and suicidal. She reported hearing voices to kill herself and do illegal things like steal. She was discharged on July 29, 2010, with diagnoses of schizoaffective disorder, polysubstance dependence and borderline personality disorder. She was assigned a GAF of 35 on admission and 70 on discharge. The notes from this visit report that she did not appear anxious and was angry that she was not restarted on a benzodiazepine. (Tr. 311-314).

Terwilliger was admitted to St. Johns Hospital on August 9, 2010, with a chief complaint of "[t]o keep from hurting myself again." The notes from this visit state she presented with depression and claimed to have been off her prescriptions for one month. She admitted to taking a lot of pills and burning herself in the past. She was discharged on August 11. (Tr. 328-332).

Terwilliger was admitted to Cox Health on August 23, 2010 and discharged on September 6. She presented to the emergency room claiming she wanted to hurt herself and overdosed on 10 tablets of Seroquel in a suicide attempt. The notes indicate she was basically homeless at that time, felt hopeless and worthless, and had been hearing voices telling her to harm herself. They indicate Terwilliger had a history of self-mutilation with burns to her harms and a history of overdoses. She responded well to individual psychotherapy but requested discharge on

September 6.  Her final diagnosis was schizoaffective disorder, bipolar type; borderline personality disorder, severe.  She was assigned a GAF of 20 upon admission and 70 upon discharge.  (Tr. 333-344).

Cox Health admitted Terwilliger again on September 19, 2010 for suicidal ideation and discharged her on September 22.  She had again attempted suicide with a Seroquel overdose.  In the psychological consultation notes from this admission, it is noted that Terwilliger was fidgety, which she claimed was typical behavior when she is anxious.  Her mood was severely depressed with significant anxiety and tearfulness, which she tried to stifle.  She was acutely suicidal.  She reported having been homeless for the past several months and not on her medications.  She was diagnosed with bereavement (due to her mother's death 13 months before) and schizoaffective disorder, bipolar type, most recent episode depressed, severe with psychotic features.  She was noted to have a history of borderline personality disorder.  She was assigned a GAF of 25 upon her initial admission to the psychiatric unit.  (Tr. 351-361).

On September 22, 2010, Terwilliger was transferred from Cox Health and admitted to Nevada Regional Medical Center.  The notes from NRMC state that Terwilliger is "an evasive and unreliable historian" who began the interview by saying she was suicidal and homicidal and psychotic and needed her Ativan for anxiety.  The notes indicate Terwilliger was disheveled, uncooperative, had poor

eye contact, had depressed mood, and had a sometimes tearful and sometimes restricted affect. She was assigned a GAF of 25 upon admission and 50 upon discharge. She was diagnosed with schizoaffective disorder, bipolar type; polysubstance dependence; and personality disorder, not otherwise specified. (Tr. 365-374).

On October 22, 2010, Terwilliger was again admitted to Cox Health after she overdosed on Ativan pills. Her discharge diagnosis was schizoaffective disorder, history of post-traumatic stress disorder, borderline personality traits. Her GAF upon admission was 30 and upon discharge was 50. The notes from this admission indicate that although the Ativan was initially stopped, Terwilliger was re-started on medication for anxiety. Her mental status examination notes state that she is a "somewhat manipulative white female" with little insight and poor judgment. (Tr. 375-387)

At the request of the department of social services disability determination services, Joan Bender, Ph.D., Clinical Psychologist, reviewed Terwilliger's records, conducted an interview with her, and completed a psychological report on her. Bender's report is dated December 1, 2010 and states Terwilliger has been staying at a domestic violence shelter for a month and had been homeless before that. She claimed to be on 13 medications but could only name a few of them and said they were not helping. Terwilliger stated that she was a drug addict but had

stopped taking marijuana and meth in August due to lack of access and the fact that her life seemed to be getting better. She had recently huffed some aerosol cans. She stated she had had 75 psychiatric hospitalizations since she was 18 years old. She began taking psychiatric medications at age 18 and has been on and off them ever since. Most recently she had been taking them for a month. She reported she was very depressed and stayed in bed crying a lot. She cried at times during the interview and her legs shook or bounced off and on. She reported having auditory hallucinations of a male voice encouraging her to commit suicide for the past 8 years. She reported having panic attacks in crowded situations with trouble breathing. She said she is afraid people will not like her and is worried they will hurt her emotionally.

Bender's diagnostic impression was that Terwilliger had a severe problem with drug addiction, had periods of psychotic depression and anxiety, and met the criteria for major depression, recurrent, severe with psychotic features; social phobia with panic attacks; personality disorder NOS; and amphetamine/cannabis/opioid dependence/abuse. She assigned a GAF of 45.

Bender formulated a "residual capacity statement" based solely on Terwilliger's psychiatric disorder as follows: Terwilliger is able to understand, recall, concentrate on, and persist on moderately complex tasks; she could handle contact with the public in low to moderate levels; could handle moderate contact

with coworkers and supervisor; could adapt to change and manage her own funds. Bender reported that Terwilliger has a "severe substance abuse problem" that "very likely impacted her other psychiatric disorders negatively." She reported that if Terwilliger could maintain her sobriety, she would be less depressed and anxious and would be able to function at a job as described in Bender's residual capacity statement. (Tr. 390-393).

On February 5, 2011, Terwilliger presented to St. Johns Hospital in Springfield, Missouri to be "cleared medically" so that she could return to "Carol Jones" where she was being treated for drug abuse. She complained of anxiety and auditory hallucinations. The notes from this visit indicate Terwilliger had recently taken a pencil eraser and "abraded" her left arm in three different places. There were also well-healed scars on her arm, and Terwilliger admitted to having had a similar episode eight months earlier. The hospital notes state that Terwilliger reported her Ambien and Klonopin were stolen over a week earlier. She told them she had a history of meth use since age 22. The notes also state that her case was discussed with psychiatry, and it was felt that Terwilliger was at low risk for harming herself or others and that she was "somewhat manipulative" in trying to obtain more medicine (Klonopin and Ambien). (Tr. 429- 435).

On February 9, 2011, Terwilliger came to the St. John's Hospital ER complaining that she was feeling dizzy and had a headache. She reported that she

frequently feels dizzy before a seizure. Her symptoms resolved after being given Compazine and Tylenol, and she was discharged the same day. (Tr. 436-444).

On February 16, 2011, Terwilliger presented to the Cox Health North emergency department complaining of hearing voices and being suicidal. Her diagnosis was a substance induced mood disorder. She reported being a meth abuser shooting 0.5 grams per day. She had been staying at (and had come from) Carol Jones Rehabilitation Center. The physician's notes indicate Terwilliger had no serious intention of killing herself. There was no indication of memory difficulties. She claimed the voices she heard were her two brothers who abused her as a child. Her father also sexually molested her as a child. The mental status examination revealed no evidence of anxiety. She was diagnosed as follows:

Axis I:     Psychosis nonspecified; methamphetamine dependence;
            cannabis abuse; use of illegal potpourri
Axis II:    Borderline personality disorder
Axis III:   History of withdrawal seizures from Trazodone, withdrawal
            from Dilantin.
Axis VI:    Moderate-to-severe drug dependence
Axis V:     Global Assessment of Functioning of 30.

The notes indicate Terwilliger was "educated about the anxiety secondary to the methamphetamine that will last a long time…." She was discharged back to her rehabilitation center on February 21. (Tr. 445-466).

Records from the Community Mental Health Center indicate Terwilliger was admitted there from February 25, 2011 to June 15, 2011. Her GAF upon

admission and discharge is listed as 35.  The notes from her time with CMHC indicated that she "made very little progress, continues to use despite negative consequences to health and well-being, attended regularly, but very manipulative, longest clean time approximately 2 weeks."  Terwilliger was discharged because of her admission to a long term inpatient program.  (Tr. 572-576).

On February 25, 2011, Terwilliger was diagnosed by the Community Mental Health Consultants (CMHC) as follows:

| | |
|---|---|
| Axis I: | Amphetamine dependence; alcohol dependence, sedative, hypnotic, or anxiolytic dependence; cannabis dependence; polysubstance dependence; schizophrenia, paranoid type. |
| Axis II: | Borderline personality disorder |
| Axis III: | Morbid obesity; chronic obstructive asthma, unspecified |
| Axis IV: | Problems with primary support group; problems related to the social environment; occupational problems; housing problems; problems related to interactions with legal system or crime; other psychosocial and environmental problems; economic problems |
| Axis V: | GAF 35 |

On March 2, 2011, the notes from the CMHC assessor indicate that Terwilliger had attempted suicide 50-60 times in her life.  She struggled with depressed mood almost every day.  She had racing thoughts and visual and auditory hallucinations telling her to harm herself.  She had rapid mood swings and digressed rapidly under stress.  She was the victim of physical abuse as a child. The assessor found her to be extremely childlike and in need of comprehensive case management and intensive day treatment to help her manage her impulses to

act out against herself or others.   She had abused prescription medications and alcohol since her admission to the facility. Terwilliger reported using a half-gram of methamphetamine per day.  She reported also using other stimulants, crack-cocaine, hallucinogens, inhalants, over-the-counter medications, sleeping pills, and IV drugs.  (Tr. 471-493).

Terwilliger was admitted to Nevada Regional Hospital on February 26, 2011 and discharged on March 2, 2011.  After admission, the notes indicate she appeared to be depressed and overwhelmed with life.  She was assigned a GAF of 30.  The discharge summary indicates she has bipolar mood disorder, type I; polysubstance abuse; and borderline personality disorder.  On discharge, she was assigned a GAF of 55.  Notes in the discharge summary state Terwilliger was admitted involuntarily for suicidal ideation.  She had just been released from rehab and stated she felt very anxious about this, so she "took a lot of Ambien and Klonopin."  The notes state that Terwilliger did "a lot of med seeking" while she was admitted.  On the day of her discharge she appeared anxious but denied suicidal ideation.  (Tr. 494-498).

On March 14, 2011, Terwilliger was seen at Nevada Regional Medical Center Behavioral Health Services.  She came to the appointment with a nurse from Nevada Mental Health, complaining of anxiety and reporting a lot of paranoia.  At the time of the appointment Terwilliger was living at Arc of Hope,

and Nevada Mental Health was managing her medications. She did not seem depressed but was "somewhat anxious" and stated that she was having auditory hallucinations. She was diagnosed with paranoid Schizophrenia; anxiety disorder, NOS; polysubstance dependence; and borderline personality disorder. She was assigned a GAF of 55. (Tr. 509).

Terwilliger was again admitted to Nevada Regional Medical Center from March 22 - 28, 2011, complaining of suicidal ideation. She reported not sleeping for two weeks due to hearing voices. The notes state that "when she is better [Terwilliger] tends to minimize her symptoms." She was diagnosed with schizoaffective mood disorder, bipolar type; polysubstance dependence in partial remission; anxiety disorder, not otherwise specified; and bipolar personality disorder. Upon discharge she was assigned a GAF of 50. (Tr. 499-505).

Terwilliger was seen at Nevada Regional Medical Center Behavioral Health Services for a psych follow-up on April 12, 2011. The notes indicate Terwilliger stated she was very depressed and still hearing voices but had not gotten her prescriptions filled because she did not have money. She was a client at Nevada Mental health and was staying at Moss House. She complained of anxiety but did not appear to be visibly anxious. She was diagnosed with Schizophrenia, paranoid type; anxiety disorder, not otherwise specified; polysubstance dependence; and borderline personality disorder. She was assigned a GAF of 50. (Tr. 508).

On May 17, 2011, Terwilliger was again seen at Nevada Regional Medical Center Behavioral Health Services for a follow-up psych visit. The notes indicate that she was accompanied by staff from Nevada Mental Health and seemed to be doing very well. Terwilliger was having "medication management" done by Nevada Mental Health to ensure she did not have too many meds at home, given her history of misuse. Terwilliger's anxiety seemed to be under control, though she was sometimes a little hyper, which the doctor felt should be monitored in case it was hypomania. At the time of this visit, Terwilliger was living at Ark of the Ozarks and seemed to be able to follow the rules there. She was diagnosed with schizophrenia paranoid type; anxiety disorder not otherwise specified; polysubstance dependence; and borderline personality disorder. She was assigned a GAF of 55. (Tr. 507).

On June 30, 2011, Terwilliger was admitted to Freeman Hospital with a "benzo overdose." She was put on 96-hour hold and admitted to the ICU. She reported feeling suicidal, hearing voices, and overdosing on Klonopin and Ambien, but her urine drug screen was negative when she was admitted to the ER. When she was asked by the doctors what they could do for her, Terwilliger stated they should start her back on all of the pills that she was on previously.

The notes from this visit state that that Terwilliger reported to have been recently residing at a shelter in Carthage, Missouri, but she was kicked out for

abusing drugs. She considered herself homeless. They also indicate that Terwilliger had diabetes that was not being well-controlled and her blood sugar would need to be closely followed. The notes state that Terwilliger had a long history of psychiatric problems and her last encounter with Freeman Health System was in 2003.

Terwilliger reported that she had guilt about her drug use, felt her concentration was not very good, had a lot of irritability and frustration, had problems with psychomotor agitation and retardation, and felt it would be all right if she did not awaken in the morning. She stated that she did not have mood swings but felt like she is in a constant state of down. She reported sometimes hearing a male voice that tells her she is no good and to hurt herself, but the doctor noted that any voices were probably secondary to Terwilliger's drug abuse and self-esteem issues. The conclusions made after Terwilliger's psychiatric exam were as follows:

Axis I:      Polysubstance abuse and dependence; psychosis, NOS; rule out schizoaffective disorder; rule out bipolar disorder; rule out major depressive disorder.
Axis II:     Personality disorder, NOS: rule out borderline personality disorder; rule out antisocial personality disorder.
Axis III:    Type 2 diabetes; COPD; history of epilepsy
Axis IV:     Environmental
Axis V:      GAF estimated 40

(Tr. 601-634).

Terwilliger was seen by Dr. Jackie Beene at the Ozarks Community Hospital sometime in June or July 2011, complaining of a pain in her side that she believed was due to kidney stones. At that time, Dr. Beene noted Terwilliger had "[n]o obvious signs of depression or psychosis." Dr. Beene ordered a drug test that was performed on July 1, 2011. The results were negative for everything except benzodiazepines. (Tr. 636-37).

On September 1, 2011, Sarmistha Bhalla, MD, of the Hope Center, an adult comprehensive psychiatric rehabilitation center, performed a psychiatric evaluation of Terwilliger. The notes indicate Terwilliger reported being a drug addict and in and out of homeless shelters, emergency rooms and inpatient psychiatric units. She reported being sexually abused as a child and starting to use drugs at age 14. She reported hearing voices and getting violent. For instance, she had recently "knocked out 10 computers in the hospital." Terwilliger stated she heard voices telling her to hurt herself or others. She reported she felt sad and depressed, and she was tearful during the interview but not suicidal. Bhalla's diagnostic formulation for Terwilliger was as follows:

| | |
|---|---|
| Axis I: | Polysubstance dependence; mood disorder, NOS, rule out bipolar disorder; psychotic disorder, NOS, history of schizophrenia; post-traumatic stress disorder. |
| Axis II: | Borderline personality disorder. |
| Axis III: | Asthma, diabetes, and seizures. |
| Axis IV: | Housing problem, severe; relationship problem, severe; financial problem, severe. |
| Axis V: | GAF score 55. |

(Tr. 685-688).

On September 13, 2011, Terwilliger again met with Bhalla at the Hope Center for a medication review. Bhalla reported Terwilliger was not suicidal, her presentation was cooperative, her mood and affect were anxious, her eye contact was good, her flow of thought was logical, her thought content was normal, she had no hallucinations or delusions, and she was well-oriented. Terwilliger's insight and judgment were fair. Bhalla's diagnostic formulation for Terwilliger was the same as her September 1 formulation. (Tr. 681-84).

On September 16, 2011, Terwilliger had an outpatient therapy visit with Dennis Campbell, MSPSY, at the Hope Center, an adult comprehensive psychiatric rehabilitation center. Campbell's notes indicate that Terwilliger was unemployed and living at the Hope Center at the time of their visit. She admitted to an extensive history of suicide attempts but was not suicidal at the time of their visit. She admitted to at times "feigning suicidal thinking due to homelessness." (Tr. 675). She reported neglect as well as emotional, physical, and sexual abuse in her childhood. She reported few friends and indicated she was somewhat close with one sister. She reported no problems with daily living but appeared to have problems with anger as she had attempted to destroy several computer monitors during a recent hospital stay. Terwilliger reported use of numerous drugs, but Campbell's notes state that her self-reporting should be considered suspect because

she had made false reports in the past to gain admission to various facilities.

Campbell reported Terwilliger was guarded, her eye contact consisted of "stares,"

her insight was fair, and her judgment was poor. She appeared wary and reserved.

She indicated that previous reports concerning auditory hallucinations may have

been made to gain admission to facilities due to homelessness. She stated "I am a

manipulator."

Campbell's diagnostic formulation for Terwilliger was as follows:

| | |
|---|---|
| Axis I: | Polysubstance dependence; mood disorder, NOS, rule out bipolar disorder; psychotic disorder, NOS, history of schizophrenia rule out malingering; post-traumatic stress disorder. |
| Axis II: | Personality disorder, NOS, with borderline and antisocial features. |
| Axis III: | Asthma, diabetes, and seizures. |
| Axis IV: | Housing problem, severe; relationship problem, severe; financial problem, severe. |
| Axis V: | GAF score 55. |

(Tr. 674-680).

Bhalla met with Terwilliger again on October 4, 2011 for a medication

review. Bhalla's report indicates Terwilliger was not suicidal, her mood was

normal, her affect was anxious, her flow of thought and thought content were

normal, she was having no hallucinations or delusions. Her insight and judgment

were fair. Bhalla's diagnostic formulation for Terwilliger was the same as

Campbell's from September 16. (Tr. 697-700).

Bhalla met with Terwilliger again on December 15, 2011 for a medication review. At that time Terwilliger had been back from rehab for 21 days. Terwilliger reported finishing the program but stated she was still depressed and having nightmares. She wanted to try Abilify. She was not suicidal. Terwilliger's mood was anxious and depressed, her affect was anxious, her flow of thought was logical, her thought content was normal, and she was not having hallucination or delusions. She was well-oriented with fair insight and judgment. Bhalla's diagnostic formulation for Terwilliger was unchanged. (Tr. 701-704).

Bhalla met with Terwilliger next on February 14, 2012 for a medication review. At that time Terwilliger reported that she was hearing voices telling her she was not good and should kill herself. She reported that she was dealing with them. She claimed she was depressed and not getting better but denied using drugs since October. She indicated she was working with vocational rehabilitation and trying to get a job. She was not suicidal. Terwilliger's mood was depressed, her affect was anxious, her flow of thought was logical, her thought content was normal, she was having no hallucinations[2] or delusions, and she was well-oriented. Terwilliger's insight and judgment were fair. Bhalla's diagnostic formulation for Terwilliger was unchanged. (Tr. 705-708).

---

[2] Bhalla indicated this by checking a box. It contradicts Bhalla's narrative report that Terwilliger claimed to be having hallucinations, but there is no explanation for the discrepancy between her report and Bhalla's checking of this box. For example, we do not know if this was an oversight or if Bhalla did not believe Terwilliger.

Bhalla met with Terwilliger next on May 1, 2012 for a medication review. Terwilliger reported having nightmares again. An ER doctor had recently taken her off Abilify because her sugars were very high. She reported feeling a little depressed but denied any use of drugs since October. Bhalla's diagnostic formulation for Terwilliger was unchanged. (Tr. 709-713).

On May 18, 2012, Terwilliger was admitted to the Callaway Community Hospital for over-dosing on Coricidin (an over-the-counter cold medicine) with the intent to get high. The records are difficult to read, but it appears she was discharged back to the Hope Center shortly after being admitted. (Tr. 729-730).

Bhalla met with Terwilliger next on July 11, 2012 for a medication review. Terwilliger reported being depressed but her nurse said she was doing great. She received third place in a weight loss program and denied any recent use of drugs. She was not suicidal. Bhalla's diagnostic formulation for Terwilliger was unchanged. (Tr. 714-716).

On October 10, 2012, Terwilliger was seen by Bhalla again for a medication review. Bhalla reported that Terwilliger indicated her depression was good but her medications were not helping her anxiety or sleep. She reported she was medicine compliant but when pressed, admitted she was not taking her Effexor. She was not suicidal. Her mood and affect were anxious, her flow of thought was logical, her thought content was normal, she was having no hallucinations or delusions, and

her insight and judgment were fair. Bhalla's diagnostic formulation for Terwilliger was unchanged. (Tr. 780-84)

On November 6, 2012, Terwilliger was admitted to St. Mary's Health Center due to worsening depression and suicidal ideation, plans for overdosing, and auditory hallucinations. She was examined by Dr. John Clemens. His notes from this visit indicate that Terwilliger was living at a residential care facility called Southside, which she was unhappy with. The notes state she was very suggestible, acknowledging nearly every symptom of depression, anxiety, suicidal ideation, with thoughts of overdosing on Coricidin, as well as auditory hallucinations telling her to hurt herself. She has a history of self-mutilation.

Clemens' mental status exam indicated Terwilliger was mildly simplistic and marginally reliable. Her mood was depressed with an incongruent affect. She was pleasant and appeared to have her anxiety controlled at the time of the exam. Her comprehension was intact but her insight and judgment seemed impaired. The diagnostic impression was given as follows:

| | |
|---|---|
| Axis I: | Major depressive disorder, recurrent with anxiety; polysubstance dependency by history in sustained remission per patient's report; history of bipolar affective disorder per patient's report. |
| Axis II: | Borderline personality traits versus probable disorder. |
| Axis III: | Hypertension, asthma, diabetes mellitus, and seizure disorder by history. |
| Axis IV: | Psycho-social stressors include poor support system, unemployed, recent move, lack of structure. |
| Axis V: | GAF of 35. |

Clemens' plan for Terwilliger was to reset her psychotropic medications and have her be highly involved with "all ward activity, groups, and activities of daily living." He noted there was a "[h]igh indication for an outpatient therapist." (Tr. 786-789).

*Dr. Marta Fliss' Records and Opinions*

The records indicate that from June 26 to November 27, 2012, Terwilliger had nine therapy sessions with Dr. Marta Fliss. I have carefully reviewed all of these records. Dr. Fliss' notes indicate that at these appointments, Terwilliger generally had good hygiene and was typically alert, oriented, and not experiencing hallucinations. Terwilliger's affect varied. On June 26 and July 10 it was described as appropriate and congruent with topics being discussed. On August 8 and August 30 it was described as labile, including tearful, sad, anxious and euthymic. On September 11, it was described as ranging from cheerful to euthymic to anxious. On November 6 it was described as depressed and anxious. Terwilliger's mood was typically reported as anxious, and depressed or sad. During the sessions, she discussed various topics, including a planned, but eventually canceled, visit to her sister; her future goals of living independently and perhaps being a parent; her anxiety surrounding the job she started in August 2012; her fear of living independently because she had never learned how to pay bills and was worried she would become homeless again; her eventual termination from the

job she started due to absences; her urges to self-harm; her arrest for shop-lifting; her embarrassment regarding the arrest; and the anxiety she experienced in group therapy.  (Tr. 790-804).

Fliss' notes from the October 24 session state that Fliss suspected Terwilliger was high during the session, even though Terwilliger denied this. Fliss' nurse noted extremely high blood pressure, sweating, and erratic movements in the waiting room.  Fliss' notes indicate that during this session she

> [f]illed out disability paperwork with client from lawyer, which prompted several important discussions…including the role substance abuse had on her mental health and vice versa; her ability to work and work performance; more details regarding how her psychiatric symptoms affected her and her relationships with others; her diagnosis and clarification on what Antisocial Personality Disorder was; and client's opinion that she was going to need to live in a supportive environment even after receiving disability versus living independently.

(Tr. 801).

Fliss' notes from the November 6 session indicate that Fliss had seen Terwilliger "in crisis" on the previous Sunday at the ER after Terwilliger had taken 48 pills of Coricidin.  Her notes state that Terwilliger denied "being a harm to self" and "related that she had only done this to get high."  During the session, Terwilliger reported recently abusing cold medicine, alcohol, K2 and whatever was available.  She reported that she did not like living at the Southside facility because the clients abused alcohol and drugs, and she was having difficulty staying sober.

Fliss' notes stated that Terwilliger was "extremely anxious" during the session and reported wanting to be hospitalized in order to help address difficulties with sobriety and urges to hurt herself. Terwilliger was transferred from Fliss' office to St. Mary's, and Fliss' staff contacted Southside to inform them of the hospitalization. (Tr. 802).

Fliss responded to several interrogatories regarding Terwilliger on October 24, 2012. Fliss reported Terwilliger was homeless and in the hospital for suicidal behaviors in Kansas City when she was enrolled in the Supported Community Living Program and placed at Hope Center. She reported that Terwilliger lived at the Hope Center for 13 months (August 2011-September 2012), and she was discharged for substance abuse and her negative impact on other residents, despite several warnings. Fliss indicated that she was treating Terwilliger based on the diagnoses given to her by Dr. Bhalla. In response to being asked whether Terwilliger's disease process has resulted in "such marginal adjustment that even a minimal increase in mental demands or a change in environment would be predicted to cause her to decompensate," Fliss wrote:

> A recent move in residential facilities has resulted in Ms. Terwilliger to be more aggressive with staff members despite her typical passive nature, arrested for shoplifting cold medicine – preferred substance of abuse, and not following diabetic diet. It does appear that Ms. Terwilliger typically does not do well with change, potentially a result of heightened anxiety and interpersonal relationship difficulties.

Fliss further reported that, given Terwilliger's current behaviors, which were occurring despite a year of intensive residential and outpatient treatment, it was her opinion that Terwilliger needs to be placed in a highly supportive living arrangement. (Tr. 717-718).

Fliss also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) on October 24, 2012. She reported that Terwilliger had a fair ability to follow work rules, relate to co-workers, and use judgment. She reported that Terwilliger had poor or no ability to deal with the public, interact with a supervisor, deal with work stresses, function independently, or maintain attention/concentration. In support of this assessment, Fliss wrote:

> Jodie had a part-time job (20 hours per week) in August for less [than] one month as she was fired for frequent absences related to poor physical health. She also was experiencing heightened symptoms of anxiety and depression. She had difficulty working with the public, getting easily overwhelmed, having panic attacks, and difficulty following through with work tasks, which were cleaning off tables in a college dorm dining room. She was also receiving supported employment services and still struggled to be successful. Her heightened level of anxiety results in poor communication, difficulty with attention and comprehension [...].[3]

Next, Fliss reported that Terwilliger had a fair ability to understand, remember and carry out simple and detailed but not complex job instructions. She reported Terwilliger had poor or no ability to understand, remember and carry out complex job instructions. In support of this, Fliss wrote that Terwilliger

---

[3] The remainder of this narrative was cut off during photo-copying.

experiences memory and comprehension difficulties attributed to racing negative thoughts, which is a symptom of her mental health difficulties of mood and anxiety.

Fliss opined Terwilliger has a fair ability to maintain her personal appearance but poor or no ability to behave in an emotionally stable manner, to relate predictably in social situations, or to demonstrate reliability. In support of this, Fliss wrote that Terwilliger must be reminded to take showers at the residential facility she lived at. She noted that Terwilliger's emotional presentation varies. She can become "intensely anxious, shaking so hard that she moved objects on my desk from her chair bumping into [it]." Fliss wrote that this was the only client for whom this had ever occurred. She reported that this would impact Terwilliger's ability to be reliable, behave in an emotionally stable manner, and be predictable. Finally she wrote that Terwilliger's "day to day presentation of symptoms can vary drastically, as can her ability to even function well in residential treatment." (Tr. 719-720).

*Psychiatric Review Technique*

After a review of Terwilliger's then-available medical records, a psychiatric review technique was completed by Elissa Lewis, Ph.D., on July 25, 2011. Lewis evaluated Terwilliger's records under the following categories: 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders; 12.04 Affective

Disorders; 12.06 Anxiety-Related Disorders; 12.08 Personality Disorders; 12.09 Substance Addition Disorders.  Under each of the categories, Lewis found that a medically determinable impairment was present that did not satisfy the diagnostic criteria.  She determined Terwilliger had major depressive disorder, borderline personality disorder, polysubstance dependence, and questionable diagnoses of schizoaffective disorder, schizophrenia, and anxiety disorder, NOS.  She found Terwilliger was mildly limited in activities of daily living and moderately limited in her ability to maintain social functioning and to maintain concentration, persistence, or pace.  Lewis found Terwilliger has had no repeated episodes of decompensation of extended duration, and for categories 12.03, 12.04, and 12.06 there was no evidence of the presence of any "C" criteria.  (Tr. 657-670).

### Residual Functional Capacity Assessment

A physical residual functional capacity assessment was completed by a single decisionmaker (SDM) on July 25, 2011.  The primary diagnosis is listed as possible seizure disorder and the SDM noted that the RFC was limited for hazards due to possible seizure disorder.  The SDM found Terwilliger had no exertional, manipulative, visual, or communicative limitations.  Under postural limitations, the SDM determined Terwilliger could frequently stoop, kneel, crouch, and crawl; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and never balance.

The SDM found Terwilliger should avoid concentrated exposure to environmental hazards, such as machinery and heights. (Tr. 70-75).

A mental residual functional capacity assessment was completed by Elissa Lewis, Ph.D., on July 25, 2011. Lewis found that Terwilliger was moderately limited in her ability to understand, remember, and carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. In all other areas of functioning, Lewis found Terwilliger was not significantly limited. (Tr. 671-73).

### *Terwilliger's Testimony before ALJ*

At the administrative hearing before the ALJ on November 20, 2012, Terwilliger testified that she was currently residing at the Southside Towne House facility in Mexico, Missouri. She stated that she completed high school and two years of college during which she studied social work. She dropped out of college due to stress, but at the time she dropped out, she was failing. (Tr. 35-36).

She testified that she worked at a care facility for the mentally disabled called the Home of Hope in Vinita, Oklahoma. She worked there for two years as a cook and/or medical tech, assisting and supervising the residents who worked in the diner/kitchen. She testified that the last time she worked there was 2008. She

was fired from her job at Home of Hope for insubordination – specifically, she had an argument with her superiors.  (Tr. 36-39).

Later in the hearing, the ALJ attempted to clarify with Terwilliger how it was that the same job was listed as both a cook and a medical tech/medical provider.  The ALJ noted that Terwilliger herself had listed that she was a medical tech from January 2010 to May 2010.  Terwilliger testified that she was more of a job coach who helped the residents prepare meals, but they were not allowed to operate the grill, so she did that (thus, the cook element).  The ALJ asked Terwilliger to explain why she had written that she also helped with patient services, daily life skills, filling out job applications, and building resumes when she was not doing any of that.  Terwilliger testified that she did not remember writing that.  She testified that a caseworker had helped her fill out her work history report.  (Tr. 58-63).

When asked to describe how her impairments affect her, Terwilliger stated her depression "gets the best of her," and on those days she cannot get out of bed and has a lot of anxiety.  She stated she has a hard time getting along with people and that being around people makes her nervous.  She testified that she had a nervous breakdown after her mother's death and was never able to come back from it.  From 2008 to 2010, she was homeless and living on the streets.  (Tr. 39-40).

Terwilliger testified she has used drugs since the age of 24 but was not using at the time of the hearing. However, she had recently had to leave her previous living facility, the Hope Center, because she had a slip-up and used over-the-counter cough medicine. She also influenced another resident to use cough medicine when she did, and during the course of her stay, she influenced other residents to do things like go out after curfew or "sneak down" and smoke. (Tr. 40-41, 54).

At the time of the hearing, Terwilliger testified she had been on her current prescription drugs for her mental health (Geodon, Effexor, Klonopin) for a week and a half, and it was too soon to know if they were providing any benefit or causing any side effects. She had previously taken Effexor on a regular basis, and it was effective, but then all of her medicines stopped being effective. (Tr. 42-43).

Terwilliger testified that she was still seeing Dr. Fliss for counseling sessions every other week, but she had not yet seen her new psychiatrist (the doctor who would prescribe her medications). She described additional mental health symptoms as mood swings and, when she is very depressed, hearing voices telling her to hurt herself. She testified that she had overdosed because of these voices. When asked, she stated was very anxious being at the hearing and interacting with the court guard. Her caseworker had accompanied her to the hearing to help her cope. She sees her caseworker once a week. (Tr. 44-46).

Terwilliger claimed at the hearing that she does not remember things like dates, names, and anniversaries very well. She does not have group sessions or otherwise really interact with the people at her current residential facility, and she cannot concentrate long enough to read. She testified that she argues with the care providers at her facility over things like smoking and taking her insulin. On a typical day, she gets up at 7:30, goes back to sleep until 10:30, then lays around in bed. She testified that she does not watch much TV and does not have visitors, but she likes to listen to music. (Tr. 47-50).

In August 2012, Terwilliger attempted to hold down a job at William Woods University, in which it was her responsibility to clean the dining room. She testified that she had a lot of anxiety around the students and hid in the bathroom and "called in" a lot. She worked there approximately 12 hours per week and was fired after one month. She testified that she called in because of depression and anxiety – she did not feel she could function in public on those days. (Tr. 50-51).

She testified that her last hospitalization occurred because she attended a counseling session with Dr. Fliss and told her she felt like hurting herself, so Dr. Fliss decided it would be best if Terwilliger went to the hospital for a medicine change. She was in St. Mary's for seven days. She testified that in the past she has burned herself as a result of depression and stress. (Tr. 51-52).

*Vocational Expert's Testimony*

Vocational expert Gary Weimholt also testified before the ALJ. Weimholt first classified the prior job held by Terwilliger at the Home of Hope as, in part, an institutional cook, which he testified has a light or medium physical demand level and is a semi-skilled job. (Tr. 57, 59-60). The "other part of the job" he eventually classified as mental retardation aide – medium, semi-skilled.[4] (Tr. 64).[5]

Weimholt then responded to a hypothetical posed by the ALJ. Specifically, the ALJ asked Weimholt to consider a hypothetical individual with the past job of mental retardation aide, assume that the individual could occasionally climb ramps and stairs, could not perform work on ladders, ropes and scaffolds, and should avoid concentrated exposure to unprotected heights and fast moving machinery. The hypothetical individual could perform simple work, interact occasionally with co-workers, supervisors and the public, but was likely to do best if allowed to work independently. The individual could adapt to change and would be able to tolerate a schedule. Weimholt testified that a person with these functional limitations would not be able to do Terwilliger's past work. He testified that such a hypothetical person would be able to perform the job of cleaner housekeeper,

---

[4] The vocational expert recognized that the residents at the facility Terwilliger worked at may not have been children but stated he was still going to classify the job in this way.

[5] It is unclear from the record if Weimholt ultimately found Terwilliger's Home of Hope job to consist of two parts or whether he determined "mental retardation aide" was sufficient to cover all of Terwilliger's responsibilities and duties. In any case, this part of the decision has not been challenged.

industrial cleaner, and metal furniture assembler.  He testified there were approximately 6500 cleaner housekeeper jobs in the regional economy and 325,000 such jobs in the national economy, 2500 industrial cleaner jobs in the regional economy and 125,000 such jobs nationally, and 1200 metal furniture assembly jobs in the regional economy and 60,000 such jobs nationally.  (Tr. 65-67).

The ALJ then posed a second hypothetical to Weimholt.  She asked him to consider an individual who could perform simple work but could not tolerate contact with co-workers, a supervisor, or the public.  This person would require a slow pace and have no tolerance for change in the workplace.  This person would likely be absent from work four days per month.  Weimholt testified that there would be no jobs available for such a person.  (Tr. 67).

Finally, Terwilliger's counsel asked Weimholt to consider a third hypothetical individual of the same age, education, and background as Terwilliger.  This hypothetical person would have no useful ability to deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability.  Weimholt testified that such a person would be unable to perform any work in the national economy.  (Tr. 68).

## III. Standard for Determining Disability under the Social Security Act

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure. 20 C.F.R. § 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, he is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work.  If the claimant can perform past relevant work, he is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, he is declared disabled.  20 C.F.R. § 404.1520; § 416.920.

### *Evaluation of Mental Impairments*

The Commissioner has supplemented the familiar five-step sequential process for evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments.  20 C.F.R. § 920a. As relevant here, the procedure requires an ALJ to determine the degree of functional limitation resulting from a mental impairment.  The ALJ considers limitation of function in four capacities deemed essential to work.  20 C.F.R. § 416.920a(c)(2). These capacities are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings.  20 C.F.R. § 416.920a(c)(3).  After considering these areas of function, the ALJ rates limitations in the first three areas as either: none;

mild; moderate; marked; or extreme. The degree of limitation with regard to episodes of decompensation is determined by application of a four-point scale: none; one or two; three; or four or more. *See* 20 C.F.R. § 416.920a(c)(4).

## IV. **The ALJ's Decision**

Applying the five-step sequential evaluation, the ALJ first determined that Terwilliger had not engaged in substantial gainful activity since the date she applied for SSI benefits.

At step two, the ALJ found that Terwilliger had severe impairments of "diabetes mellitus, morbid obesity, and mental impairments variously diagnosed as borderline personality disorder, anti-social personality disorder, bipolar disorder, psychotic disorder, post-traumatic stress disorder, depression, and substance abuse." She noted that Terwilliger is capable of working despite her use of drugs. Therefore, while her substance abuse is an impairment, the ALJ found Terwilliger is not disabled even with the impairments, and her substance abuse is not material to a determination of disability.

At step three, the ALJ determined that Terwilliger does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *See also* 20 CFR 416.920(d). In making this determination, the ALJ reviewed whether Terwilliger's mental impairments met the criteria of listings 12.04, 12.06,

12.08, or 12.09. To do this, the ALJ considered whether the "paragraph B" criteria were satisfied and determined that they were not. She found Terwilliger had mild restrictions in the activities of daily living; moderate difficulties with social functioning; moderate difficulties with regard to concentration, persistence, or pace; and no episodes of decompensation of extended duration. The ALJ determined that none of the "paragraph C" criteria of the relevant listings were satisfied.

Next, the ALJ found that Terwilliger has the residual function capacity to perform a full range of work at all exertional levels but can only occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; and never have exposure to unprotected heights and fast-moving machinery. She determined Terwilliger should be limited to simple work, occasionally interacting with coworkers, supervisors, and the public and, preferably, allowed to work independently. The ALJ determined Terwilliger can adapt to change and tolerate a schedule.

In fashioning Terwilliger's RFC, the ALJ determined that her medical impairments could be expected to cause some of her alleged symptoms, however, after reviewing the evidence of record and evaluating the credibility of Terwilliger's allegations, she determined that Terwilliger's impairments limit her only to the extent stated in the ALJ's residual functional capacity finding. The

ALJ opined that the evidence suggested Terwilliger's subjective complaints as to the disabling nature of her symptoms were out of proportion to the objective medical evidence. In concluding this, she noted that Terwilliger's mental status examinations have "yielded largely normal results," that her "behavior during mental status examinations was incongruent with her allegations," that while seeking care for her conditions, she was "noted to have no obvious depression or psychosis," that she was described as manipulative, that she was often assigned a global assessment of functioning (GAF) score of 55, that a history of noncompliance with medication was noted in her history, that there was a question in her records of whether she was malingering, and she was noted to be resistant to intervention and only marginally reliable. (Tr. 17). Additionally, the ALJ noted that there was a significant question, with regard to many of Terwilliger's episodes of treatment, of whether Terwilliger was actually experiencing the symptoms she alleged or whether her "hospitalizations were motivated by issues of homelessness." (Tr. 18). The ALJ also noted that her motivation for seeking treatment and her subjective complaints lacked credibility because the medical record showed that she engaged in drug-seeking behavior. (Tr. 18). Finally, the ALJ noted that Terwilliger's "poor work and earnings history and multiple applications for disability benefits raise questions as to whether the claimant's continuing unemployment is actually due to medical impairments."

The ALJ accorded significant weight to the medical opinion of Disability Determination Services consultant Elissa Lewis, Ph.D., who reviewed Terwilliger's record but did not examine her. The ALJ credited Lewis' opinion because Lewis had access to a significant number of Terwilliger's treatment records, she conducted a comprehensive review, and her opinion is consistent with the record as a whole, as well as with Terwilliger's self-reports.

The ALJ accorded reasonable weight to the medical opinion of Dr. Sarmistha Bhalla, M.D., as it was expressed in Terwilliger's GAF score, because it was based on an examination of Terwilliger and is consistent with the record as a whole. The ALJ noted that Bhalla evaluated Terwilliger prior to establishing a treatment relationship but "did not express an opinion that the claimant was totally disabled, despite ongoing treating relationship."

The ALJ accorded limited weight to the medical opinion of Dr. Marta Fliss, Ph.D. In doing so, the ALJ noted that Dr. Fliss "admitted to filling out the above-mentioned forms with the claimant, even though she believed the claimant was high at the time." Furthermore, the ALJ believed Fliss' assessment reflected Terwilliger's limitations when she is using drugs and was influenced by both Terwilliger's drug use and her self-reporting. The ALJ found Fliss' opinion was "inconsistent with numerous other treatment notes showing that Terwilliger had only moderate symptoms and impairments."

At step four, in light of Terwilliger's RFC, the ALJ relied on the testimony of the vocational expert in determining that Terwilliger is unable to perform past relevant work.

At step five, the ALJ again relied on the vocational expert's testimony in determining that Terwilliger is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and concluded that Terwilliger was not disabled.

## V.    <u>Standard of Review</u>

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2003). "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion. *Id.* When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005), or because the court would have weighed the evidence differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

## VI.    Discussion

In this appeal, Terwilliger argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ improperly evaluated and weighed the opinion of treating psychologist Dr. Marta Fliss. Terwilliger avers that the ALJ's reasons for not giving Fliss' opinion controlling weight were legally insufficient.  Even if they were sufficient, however, she argues the ALJ's decision is still unsupported by substantial evidence because she failed to properly evaluate what weight to give Fliss' opinion under 20 C.F.R. § 416.927(d) and SSR 96-5p.

As discussed above, in according Fliss' opinion limited weight, the ALJ appeared to rely on three factors.  First, she noted that Fliss "admitted to filling out the above-mentioned forms with the claimant, even though she believed the

claimant was high at the time." Second, she believed Fliss' assessment reflected Terwilliger's limitations when she is using drugs and was influenced by both Terwilliger's drug use and her self-reporting. Finally, the ALJ found Fliss' opinion was "inconsistent with numerous other treatment notes showing that Terwilliger had only moderate symptoms and impairments."

The regulations require that a treating source's opinion be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." 20 C.F.R. § 416.927(c)(2). However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). An ALJ may discount or disregard the opinion of a treating physician where other medical assessments are supported by better medical evidence, or where the treating physician renders inconsistent opinions that undermine his credibility. *Id*. at 897-98.

### *Whether Fliss' Opinion Was Well-Supported by Acceptable Diagnostic Techniques*

Fliss was a treating source whose records indicate that she met with Terwilliger on at least nine occasions for an hour or longer. Seven of those meetings occurred prior to Fliss' submission of her medical assessment. Although the ALJ's opinion did not explicitly state that Fliss' opinion was not "well-

supported by medically acceptable clinical and laboratory diagnostic techniques," her belief that Fliss was improperly influenced either by Terwilliger's drug use or her self-reporting seems to indicate the ALJ's suspicion of Fliss' methods.

I find that the ALJ's determination, to the extent she made one, that Fliss' methods were not supported by medically acceptable diagnostic techniques because Fliss was improperly influenced by Terwilliger's drug use and/or self-reporting is not supported by substantial evidence. First, the ALJ opined that Fliss' assessment "appears to reflect the claimant's limitations when the claimant is using drugs as the claimant admitted to using drugs [on] several occasions before and after Dr. Fliss completed her statement." Although many of Fliss' therapy notes indicate that Terwilliger reported relapsing at various times outside her appointments, the only note in which Fliss stated she believed Terwilliger was high *during* their therapy session is the one from October 24. There is no evidence to suggest that Terwilliger was high during the remaining sessions on record. However, even if Terwilliger were high in other therapy sessions, Fliss possesses a doctorate degree in psychology and has given no indication that she would be unable to separate the symptoms or effects of Terwilliger's substance abuse from the symptoms or effects of Terwilliger's other mental health issues.

Furthermore, the Medical Assessment of Ability to Do Work-Related Activities (Mental) form clearly mandates, at the very top, in underlined language,

that the medical care provider's assessment must be made based on the patient's condition aside from any drug or alcohol abuse problems. Fliss did not indicate, anywhere on the form (or in any of her therapy notes or responses to interrogatories), an inability to separate these issues. And nothing in Fliss' notes from October 24, the day she completed the assessment, leads to a conclusion that she did not follow the instructions. Fliss' therapy notes report a belief that Terwilliger was high on October 24. But nothing indicates that the assessment was completed based exclusively on Fliss' observations of Terwilliger on October 24 instead of on her observations of Terwilliger during their previous six meetings. Additionally, Fliss' notes from October 24 state that completing the assessment "prompted several important discussions….including the role substance abuse had on [Terwilliger's] mental health and vice versa." This language indicates an effort by Fliss to separate symptoms caused by Terwilliger's substance abuse from symptoms caused by her other mental health impairments, not a failure to do so.

As for the ALJ's assertion that Fliss was unduly influenced by Terwilliger's self-reporting, I find no evidence of this in Fliss' notes, and the ALJ did not cite any specific evidence to support her allegation. It is clear that therapy sessions between Fliss and Terwilliger involved a two-way discussion about Terwilliger's addictions and other mental health problems. But, that is not out of the ordinary

for a therapy session, and in any case that alone does not establish evidence of unacceptable diagnostic techniques.

### *Whether Fliss' Opinion Was Inconsistent with Other Substantial Evidence*

Next, the ALJ discounted Fliss' opinions because they were "inconsistent with numerous other treatment notes showing that the claimant had only moderate symptoms and impairments." Assuming this constitutes a finding by the ALJ that Fliss' opinions were inconsistent with other substantial evidence in the case record, I conclude the ALJ's decision is not supported by substantial evidence on the record.

Fliss opined that Terwilliger's occupational limitations were a result, almost exclusively, of Terwilliger's anxiety and depression. She noted that during Terwilliger's brief employment in August 2012, Terwilliger experienced heightened symptoms of anxiety and depression, was easily overwhelmed, had panic attacks, and, as a result of her heightened anxiety, displayed poor communication and difficulties with attention and comprehension. Fliss next opined that Terwilliger experiences memory and comprehension difficulties due to racing negative thoughts, which are a symptom of her mood and anxiety problems. She reported that Terwilliger experiences intense episodes of anxiety, which affect her ability to be reliable and predictable and behave in an emotionally stable

manner. She noted that Terwilliger's presentation of symptoms can vary drastically from day to day.

In her discussion of Fliss' opinion, the ALJ did not specifically state which medical records she felt were inconsistent with Fliss' assessment. However, earlier in her opinion, the ALJ discussed other medical records, and in doing so, appeared to credit records indicating that Terwilliger experienced depression and anxiety. Specifically, she opined that "[m]ental status examinations revealed a flat or constricted affect, depressed, angry or anxious mood; psychomotor retardation; circumstantial thought process; hallucinations and poor insight and judgment…" However, she noted, many of the mental status examinations "yielded normal results in other areas." This evidence (and the ALJ's discussion of it), instead of conflicting with Fliss' opinion, appears to support it. The medical records, or portions thereof, that the ALJ credited supported Fliss' finding of depression and anxiety. The medical records, or portions thereof, that the ALJ did not credit, spoke to health issues that did not contribute to Fliss' opinion of Terwilliger's ability to work.

Additionally, in performing her credibility assessment, the ALJ seemed to discount Terwilliger's own complaints of anxiety based on three records. (Tr. 17, citing Exhibits 16F/6, 20/F3 and 36/F4). However, in two of the cited records, despite noting that Terwilliger did not appear anxious at the time of her exam, the

48

providers nonetheless still credited her reports of anxiety. One of them rendered a diagnosis of anxiety disorder (among other mental health diagnoses) and the other rendered a diagnosis of major depressive disorder, recurrent, with anxiety. (Tr. 508, 788).

Most, if not all, of Terwilliger's medical records during the relevant time period mention the presence of anxiety, depression, or both. From late 2011 through mid-2012, while Terwilliger was residing in a supported living facility, there is little or no evidence that Terwilliger was using drugs, and yet she still reported the presence of depression and anxiety. In fact, there is significant evidence throughout the record that Terwilliger has substantial difficulty functioning properly in her day-to-day life even while residing in an adult care facility where her activities, drug use, and mental health are closely monitored. This evidence supports Fliss' opinion that Terwilliger would have serious problems transitioning to and maintaining a job.

Finally, in fashioning the mental portion of Terwilliger's RFC, the ALJ primarily relied on the opinion of Elissa Lewis, Ph.D., who did not examine Terwilliger but reviewed her records on July 25, 2011. Lewis determined that Terwilliger had, among other impairments, major depressive disorder and a questionable diagnosis of anxiety disorder. Lewis found Terwilliger would be only mildly to moderately limited in her ability to function in a job. The ALJ found that

Lewis' opinion was "consistent with the record as a whole, including treatment notes obtained after she rendered her opinion, as well as with the claimant's self-reports."

As an initial matter, Terwilliger has pointed out that the ALJ's interpretation of Terwilliger's self-reports varied throughout her decision. First the ALJ concluded that Terwilliger's self-reports described "disabling symptoms." Next, the ALJ concluded that Lewis' opinion that Terwilliger did not have disabling symptoms was supported by Terwilliger's self-reports. Finally, the ALJ concluded that Fliss' opinions, which seemed to find disabling symptoms, were improperly influenced by Terwilliger's self-reports (suggesting that Terwilliger actually did report disabling symptoms). These discrepancies support my conclusion that the ALJ's analysis of the weight to accord Fliss' opinion was problematic.

More importantly, however, in the absence of other medical evidence inconsistent with Fliss' assessment, Lewis' opinion by itself is not sufficient evidence to discredit Fliss' medical opinion.[6] "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v.*

---

[6] It should be noted that the opinion of consulting source Dr. Joan Bender, dated December 1, 2010, supports the ALJ's RFC determination, but Dr. Bender's opinion was never weighed, cited, or discussed by the ALJ. It was also rendered prior to the date of Terwilliger's alleged disability and is of very limited relevance to the effect of her impairments today.

*Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003); *see also Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); *Jenkins v. Apfel*, 196 F.3d 922, 924-25 (8th 1999).

**VII.**   <u>**Conclusion**</u>

For the aforementioned reasons, I conclude that the ALJ failed to accord proper weight to the opinion of treating source Dr. Marta Fliss, and therefore her decision was not supported by substantial evidence on the record.  As a result, I will remand for the ALJ to render a decision consistent with this order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and remanded under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 31st day of March 2015.